IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. CR-19-073-R |
| | ) |
| DOMINIC EUGENE HUNT, | ) |
| | ) |
| Defendant. | ) |

### ORDER

Before the Court is Defendant Dominic Hunt's Motion in Limine to Exclude Ballistic Evidence, or Alternatively, for a *Daubert* Hearing. Doc. No. 67. The Government has responded in opposition to the motion. Doc. No. 81. Upon review of the parties' submissions, the Court denies Defendant's motion.

**I.  Background**

On November 6, 2019, a federal grand jury returned a nine-count, third superseding indictment charging Defendant with, as relevant here, two counts of being a felon in possession of ammunition. Doc. No. 41. The two counts—Counts Eight and Nine—stem from two shootings: One in January of 2019 and another in February of 2019. *Id*. During the Oklahoma Police Department's (OCPD) investigation at the scene of the first shooting, officers found a Blazer 9mm Luger cartridge casing—the basis for Count Eight. *Id.* at 5–6. During the OCPD's investigation at the scene of the second shooting, officers found a Blazer 9mm Luger cartridge casing and two Winchester 9mm Luger cartridge casings—the basis for Count Nine. *Id.* at 6. Ronald Jones, a firearm and toolmark examiner for the

1

OCPD, examined the casings and concluded that all four casings were likely fired from the same unknown firearm, potentially a Smith & Wesson 9mm Luger caliber pistol. Doc. Nos. 81–1, 81–2. Howard Kong, a firearm and toolmark examiner for the Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF) Forensic Science Laboratory, found the same. Doc. No. 81–4. The Government anticipates calling Mr. Jones and Mr. Kong at trial to "testify regarding their training, experience, and qualifications, the basis for firearms identification, their methods of examination in this case, their findings, and the basis for those findings." Doc. No. 81, pp. 4–5. Specifically, the Government intends its experts to testify that:

> (1) the ammunition charged in Count Eight was not fired from the Springfield Armory 9mm Luger caliber pistol [the Defendant's brother] had on March 11, 2019; (2) the ammunition charged in Count Eight was not fired from the Smith & Wesson .40 caliber pistol [the Defendant's cousin] was convicted of possessing on January 20, 2019; (3) the probability the ammunition charged in Count Nine were fired in different firearms is so small it is negligible; (4) the ammunition charged in Count Nine was not fired from [the] Smith & Wesson .40 caliber pistol . . . ; (5) the probability the ammunition charged in Counts Eight and Nine were fired in different firearms is so small it is negligible; and (6) the unknown firearm was likely a Smith & Wesson 9mm Luger caliber pistol.

*Id.* Defendant now moves to exclude the testimony of Mr. Jones and Mr. Kong, or alternatively, for a *Daubert* hearing. Doc. No. 67.

## II.   Legal Standard

When it comes to the admissibility of expert evidence, district courts maintain the role of gatekeeper. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2005). In that role, district courts must adhere to Federal Rule of Evidence 702, which demands that courts "assess proffered expert testimony to ensure it is both relevant and reliable." *United*

*States v. Avitia-Guillen*, 680 F.3d 1253, 1256 (10th Cir. 2012). To do this, "the district court generally must first determine whether the expert is qualified . . . ." *United States v. Nacchio,* 555 F.3d 1234, 1241 (10th Cir.2009) (en banc). If the expert is sufficiently qualified, then "the court must determine whether the expert's opinion is reliable . . . ." *Id.* "Although a district court has discretion in how it performs its gatekeeping function, 'when faced with a party's objection, [the court] must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper.'" *Avitia-Guillen*, 680 F.3d at 1257 (quoting *Goebel v. Denver & Rio Grande W. R.R. Co.,* 215 F.3d 1083, 1088 (10th Cir. 2000)). "The proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible." *Nacchio*, 555 F.3d at 1241.

Here, Defendant Hunt does not object to the relevancy of the experts' testimony nor to the experts' qualifications. Defendant objects only to the reliability of the experts' testimony. Doc. No. 67, pp. 11–18. Therefore, the Court need only address whether the experts' testimony is reliable. *See Avitia-Guillen*, 680 F.3d at 1257.

"To determine reliability, courts assess the reasoning and methodology underlying the [experts'] opinion . . . ." *Thompson v. APS of Oklahoma, LLC*, No. CIV-16-1257-R, 2018 WL 4608505, at *4 (W.D. Okla. Sept. 25, 2018) (internal quotation marks and citation omitted). "The reliability standard is lower than the merits standard of correctness, and plaintiffs need only show the Court that their experts' opinions are reliable, not that they are substantively correct." *Id.* (internal quotation marks and citation omitted). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 5093 U.S. 579 (1993), the Supreme Court provided a non-exhaustive list of factors to aid in this determination:

3

(1) whether the particular theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community.

*United States v. Baines*, 573 F.3d 979, 985 (10th Cir. 2009) (citing *Daubert*, 509 U.S. at 592–94).[1] The reliability inquiry, however, is fact- and case-specific: no one factor is dispositive or always applicable, and the goal remains "ensuring that an expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Bitler*, 400 F.3d at 1233 (quoting *Kumho Tire Co.* v. Carmichael, 526 U.S. 137, 152 (1999)).

### III.  Firearm Toolmark Identification

In his motion, Defendant challenges the Governments use of firearm toolmark identification. "Forensic toolmark identification is a discipline that is concerned with the matching of a toolmark to the specific tool that made it. Firearm identification is a specialized area of toolmark identification dealing with firearms, which involve a specific category of tools." *United States v. McCluskey*, No. 10-2734, 2013 WL 12335325, at *3 (D.N.M. Feb. 7, 2013) (citation omitted). "Toolmark identification is based on the theory that tools used in the manufacture of a firearm leave distinct marks on various firearm components, such as the barrel, breech face, or firing pins . . . [and] that the marks are individualized to a particular firearm through changes the tool undergoes each time it cuts

---

[1] *Daubert* itself was limited to scientific evidence, *see United States v. Baines*, 573 F.3d 979, 985 (10th Cir. 2009), but in *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999), the Supreme Court made clear that the gatekeeping obligation of the district courts described in *Daubert* applies, not just to scientific testimony, but to all expert testimony. *Id.* at 141.

4

and scrapes metal to create an item in the production of the weapon." *Id.* at 4. The field of firearm toolmark examination is based on the theory that some of these markings will be transferred to a bullet fired from the gun. *Id.* In conducting a firearm toolmark examination, a firearms examiner observes three types of characteristics:

> (1) <u>Class characteristics</u>: i.e., the weight or caliber of the bullet, the number of lands and grooves, the twist of the lands and grooves, and the width of the lands and grooves, that appear on all bullet casings fired from the same type of weapon and are predetermined by the gun manufacturer;
>
> (2) <u>Individual characteristics</u>: unique, microscopic, random imperfections in the barrel or firing mechanism created by the manufacturing process and/or damage to the gun post-manufacture, such as striated and/or impressed marks, unique to single gun; and
>
> (3) <u>Subclass characteristics</u>: characteristics that exist, for example, within a particular batch of firearms due to imperfections in the manufacturing tool that persist during the manufacture of multiple firearm components mass-produced at the same time.

*Ricks v. Pauch*, No. 17-12784, 2020 WL 1491750, at *8–9 (E.D. Mich., 2020). Pursuant to the theory used by the Government's experts in this case—the Association of Firearms and Toolmark Examiners (AFTE) method—"a qualified examiner can determine whether two bullets were fired by the same gun by comparatively examining bullets and determining whether 'sufficient agreement' of toolmarks exist," meaning that there is significant similarity in the individual markings found on each bullet. *Id.* at 9.

### IV.    *Daubert* **Analysis**

The use of this type of firearm toolmark identification in criminal trials is "hardly novel." *United States v. Taylor*, 663 F. Supp. 2d 1170, 1175 (D.N.M. 2009). "For decades . . . admission of the type of firearm identification testimony challenged by the defendant[] has been semi-automatic . . . ." *United States v. Monteiro,* 407 F. Supp. 2d 351, 364 (D. Mass. 2006); *see also, e.g., United States v. Hicks,* 389 F.3d 514 (5th Cir. 2004); *United States v. Johnson*, 875 F.3d 1265, 1281 (9th Cir. 2017). Indeed, no federal court has deemed such evidence wholly inadmissible. *See United States v. Romero-Lobato*, 379 F. Supp. 3d 1111, 1117 (D. Nev. 2019). Having been routinely admitted, "[c]ourts [are] understandably . . . gun shy about questioning the reliability of [such] evidence," *Monteiro,* 407 F.Supp.2d at 364. However, because of the seriousness of the criticisms launched against the methodology underlying firearms identification by Defendant in this case, the Court will carefully assess the reliability of this methodology, using *Daubert* as a guide. *See, e.g., Taylor*, 663 F. Supp. 2d at 1176.[2]

The first *Daubert* factor asks whether the experts' particular theory can be and has been tested. *Daubert*, 509 U.S. at 592–94. Defendant argues—without citation—that the theory of firearm toolmark identification rests on an assumption that has not been properly tested. Doc. No. 67, pp. 13–14. The Government responds that its experts' testimony is based upon the theory and methodology developed by the Association of Firearms and

---

[2] Some Courts have analyzed whether firearm toolmark identification can fairly be called "science" before evaluating the *Daubert* factors. *See United States v. Glynn*, 578 F. Supp. 2d 567, 570 (S.D.N.Y. 2008). The Court need not conduct such an analysis here. Though Defendant argues firearm toolmark identification is not a science, Doc. No. 67, p. 14, it is clearly "technical or specialized, and therefore within the scope of Rule 702." *United States v. Willock*, 696 F. Supp. 2d 536, 571 (D. Md. 2010), *aff'd sub nom. United States v. Mouzone*, 687 F.3d 207 (4th Cir. 2012).

6

Toolmark Examiners (AFTE), and that this theory has been well tested. Doc. No. 81, pp. 15–16. The Court agrees.

Put simply, the theory of firearm toolmark identification can be and has been tested. *See, e.g.,* The Association of Firearm and Tool Mark Examiners, *Testability of the Scientific Principle* (last visited May 14, 2020), https://tinyurl.com/yal3ja4t (collecting studies). This conclusion is supported by other courts within the Tenth Circuit that have already addressed the issue at length, *see, e.g., United States v. Taylor*, 663 F. Supp. 2d 1170, 1176 (D.N.M. 2009) ("[T]he methods underlying firearms identification can, at least to some degree, be tested and reproduced"), in addition to a number of other courts outside the Circuit, *see, e.g., Romero-Lobato*, 379 F. Supp. 3d at 1118–19 (collecting cases where "federal courts have held that the AFTE method can be and has been frequently tested" and holding the same). Accordingly, this first *Daubert* factor weighs in favor of admissibility.

The second *Daubert* factor asks whether the technique has been subjected to peer review and publication. *Daubert*, 509 U.S. at 593–94. Defendant argues that there have not been enough studies done of firearm toolmark identification, and that the studies available have not been subject to peer review. Doc. No. 67, p. 14. The Government contends that analysis recently provided by federal courts tells a different story. The Court agrees.

In evaluating whether AFTE's method of firearm toolmark identification satisfies the second *Daubert* factor, the United States District Court for the District of Nevada recently found that:

> AFTE publishes its own journal, the appropriately named *ATFE Journal*, which is subject to peer review. According to AFTE's website, the *AFTE Journal*, "is dedicated to the sharing of information, techniques, and

7

> procedures," and the papers published within "are reviewed for scientific validity, logical reasoning, and sound methodology." [*What is the Journal?*, The Association of Firearm and Tool Mark Examiners, https://afte.org/afte-journal/what-is-the-journal (last visited May 1, 2019)]. Several published federal decisions have also commented on the *AFTE Journal*, with all finding that it meets the *Daubert* peer review element. *See U.S. v. Ashburn*, 88 F.Supp.3d 239, 245–46 (E.D.N.Y. 2015) (finding that the AFTE method has been subjected to peer review through the *AFTE Journal*); *U.S. v. Otero*, 849 F.Supp.2d 425, 433 (D.N.J. 2012) (describing the *AFTE Journal*'s peer reviewing process and finding that the methodology has been subjected to peer review); *U.S. v. Taylor*, 663 F.Supp.2d 1170, 1176 (D.N.M. 2009) (finding that the *AFTE* method has been subjected to peer review through the *AFTE Journal* and two articles submitted by the government in a peer-reviewed journal about the methodology); *U.S. v. Monteiro*, 407 F.Supp.2d 351, 366–67 (D. Mass. 2006) (describing the *AFTE Journal*'s peer reviewing process and finding that it meets the *Daubert* peer review element). And of course, the NAS and PCAST Reports themselves constitute peer review despite the unfavorable view the two reports have of the AFTE method.

*Romero-Lobato,* 379 F. Supp. 3d at 1119. The second *Daubert* factor thus weighs in favor of admissibility.

Defendant suggests that the studies mentioned above are insufficient because they were not "black-box" studies.[3] Doc. No. 67, p. 14. Defendant then cites the PCAST Report, arguing that there has been only one black-box study on firearms identification and that this one study has never been subject to peer review. *Id.* The PCAST Report cited by Defendant "rejected studies that it did not consider to be blind, such as where the examiners knew that a bullet or spent casing matched one of the barrels included with the test kit . . . ." However, "The PCAST Report did not reach a conclusion as to whether the AFTE

---

[3] A black-box study is a blind study where "many examiners are presented with many independent comparison problems—typically involving 'questioned' samples and one or more 'known' samples—and asked to declare whether the questioned samples came from the same sources as one of the known samples. The researchers then determine how often examiners reach erroneous conclusions." President's Council of Advisors on Science and Technology, Exec. Office of the President, Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods, 49 (2016), available at https://tinyurl.com/j29c5ua.

8

method was reliable or not because there was only one study available that met its criteria." *Id.* The Court does not similarly restrict its judicial review to techniques tested through black-box studies. The Court does, however, approve of the PCAST Report's ultimate conclusion: "[W]hether firearms analysis should be deemed admissible based on the 'current evidence' is a decision that should be left to the courts." *Id.*

The third *Daubert* factor asks whether the technique has a known or potential rate of error. *Daubert*, 509 U.S. at 594. Defendant contends that because there is only one black-box study, there is not enough information available to determine a known or potential rate of error in the field of firearm toolmark identification. Doc. No. 67, p. 14. The Government objects, citing federal cases discussing studies that evidence a low rate of error in firearms analysis. Doc. No. 81, pp. 17–18. Again, the Court agrees with the Government.

As noted above, the Court declines Defendant's invitation to restrict judicial review to techniques tested through black-box studies. "*Daubert* does not mandate such a prerequisite for a technique to satisfy its error rate element." *Romero-Lobato*, 379 F. Supp. 3d at 1120. Still, the Government bears the burden to demonstrate that its experts' methodology is reliable. *See Nacchio*, 555 F.3d at 1241. To that end, the Government cites federal cases that discuss a number of studies which report a low error rate for the AFTE method. Doc. No. 81, p. 17 (citing *Romero-Lobato*, 379 F. Supp 3d at 1117–18 and *United States v. Otero*, 849 F. Supp. 2d 425, 433–34 (D.N.J. 2012)). Those cases discuss, for example, a Miami-Dade Study that reported a potential error rate of less than 1.2% and an error rate by the participants of 0.07%, in addition to an Ames Study that reported a false positive rate of 1.52%. *Id.*

Other federal courts examining the AFTE method's rate of error have likewise found it to be low. *See, e.g., v. Ashburn*, 88 F. Supp. 3d 239, 246 (E.D.N.Y. 2015) ("the error rate, to the extent it can be measured, appears to be low, weighing in favor of admission"); *United States v. Taylor*, 663 F. Supp. 2d 1170, 1177 (D.N.M. 2009) ("this number [less than 1%] suggests that the error rate is quite low"). Even courts that have found it impossible to calculate an absolute error rate for firearm toolmark identification, have ultimately concluded that the known error rate is not "unacceptably high." *United States v. Monteiro*, 407 F. Supp. 2d 351, 367–68 (D. Mass. 2006). Defendant does not introduce any contradictory studies. *See* Doc. No. 67, p. 14. Based on the record before the Court, this third *Daubert* factor weighs in favor of admissibility.

The fourth *Daubert* factor asks whether there are standards that control the technique's operation. *Daubert*, 509 U.S. 594. Defendant argues that there are no uniform standards controlling the AFTE method of firearm toolmark identification, and that instead, the AFTE method is based on subjective methodology. Doc. No. 67, p. 14. The Government argues that this subjectivity does not weigh against admissibility under the fourth *Daubert* factor. Doc. No. 81, p. 18. The Court disagrees.

A main criticism of the AFTE method is that firearm examiners do not reach their conclusions through objective criteria. *See Romero-Lobato*, 379 F. Supp. 3d at 1120-121. Instead, examiners use a high-powered microscope, in conjunction with their experience and training, to determine if there is "sufficient agreement" between the "unique surface contours" of two firearm toolmarks. *AFTE Theory of Identification*, The Association of Firearm and Tool Mark Examiners, *available at* https://afte.org/about-us/what-is-afte/afte-

theory-of-identification (last visited May 14, 2020). "The statement that "sufficient agreement" exists between two toolmarks means that the agreement of individual characteristics is of a quantity and quality that the likelihood another tool could have made the mark is so remote as to be considered a practical impossibility." [4] *Id.* Ultimately, the AFTE itself recognizes that their method is "is subjective in nature." *Id.* So too have other courts. *See Romero-Lobato*, 379 F. Supp. 3d at 1121 (collecting cases). This fourth factor, unlike the previous three, weighs against admissibility.

The fifth and final *Daubert* factor asks whether the theory or technique enjoys general acceptance within the relevant community. *Daubert*, 509 U.S. at 594. Defendant argues that the limitations of firearm toolmark identification is recent and growing, and that because courts have not seriously considered all aspects of the field or tested its reliability since the PCAST Report was published, the fifth *Daubert* factor is not satisfied here. Doc. No. 67, p. 15. The Government responds arguing that nearly every court to have addressed the issue has found that the AFTE method enjoys general acceptance within the

---

[4] The AFTE further details their methodology in the following manner:

> "[S]ufficient agreement" is related to the significant duplication of random toolmarks as evidence by the correspondence of a pattern or combination of patterns of surface contours. Significance is determined by the comparative examination of two or more sets of surface contour patterns comprised of individual peaks, ridges and furrows. Specifically, the relative height or depth, width, curvature and spatial relationship of the individual peaks, ridges and furrows within one set of surface contours are defined and compared to the corresponding features in the second set of surface contours. Agreement is significant when the agreement in individual characteristics exceeds the best agreement demonstrated between toolmarks known to have been produced by different tools and is consistent with agreement demonstrated by toolmarks known to have been produced by the same tool.

*AFTE Theory of Identification*, The Association of Firearm and Tool Mark Examiners, *available at* https://afte.org/about-us/what-is-afte/afte-theory-of-identification (last visited May 14, 2020).

relevant community—both before and after publication of the PCAST Report. Doc. No. 81, p. 19. The Court agrees.

The AFTE method easily satisfies this final factor. *See Romero-Lobato*, 379 F. Supp. 3d at 1122 (collecting cases finding the AFTE theory to be widely accepted in the relevant community and finding the same). In fact, the AFTE method used by the Government's experts here, is "the field's established standard." *See Ashburn*, 88 F. Supp. 3d at 246. That the NAS and PCAST Reports criticize the method does not undermine the Court's conclusion. "Techniques do not need to have universal acceptance before they are allowed to be presented before a court." *Romero-Lobato*, 379 F. Supp. 3d at 1122 (citing *Daubert*, 509 U.S. at 588–99). Accordingly, this factor weighs in favor of admissibility.

Balancing the *Daubert* factors, the Court finds that the Government's expert testimony, derived from the AFTE methodology, is reliable and therefore admissible—though subject to the limitations discussed below. The only factor that weighs against admissibility is the fourth *Daubert* factor, which highlights the AFTE's subjective processes. But, "the subjectivity of a methodology is not fatal under Rule 702 and *Daubert*." *United States v. Ashburn*, 88 F. Supp. 3d 239, 246 (E.D.N.Y. 2015). By its terms, Federal Rule of Evidence 702 permits an expert with sufficient knowledge, experience, or training to testify about a particular subject matter. *See* Fed. R. Evid. 702; *Romero-Lobato*, 379 F. Supp. 3d at 1120. *Daubert* does not impose a rigid requirement that the expert reach a conclusion through an entirely objective set of criteria. *See Daubert*, 509 U.S. at 594–595. Here, the lack of objective criteria is overcome by the Government's introduction of evidence demonstrating that the method has been tested, reviewed by peers and subject to

publication, found to have a potential low rate of error, and widely accepted in the relevant community. Moreover, Defendant has not cited a single case where a federal court has completely prohibited firearms toolmark identification testimony under *Daubert*.

V.     **Federal Rules of Evidence 702(d)**

Next, Defendant argues that even if the expert testimony is admissible under *Daubert*, the Government has not met its burden under Rule 702(d) to show that its experts reliably applied the AFTE method in this case. Under that Rule:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> . . .
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702(d). Here, Defendant makes four specific objections. He argues that the Government has not complied with Rule 702(d) because its experts failed to document the basis for their findings, that a second examiner did not verify or review the experts' work, and that the experts failed to comply with two "validity" requirements discussed by the PCAST Report. Doc. No. 67, p. 17. The Government denies the validity of each objection. Doc. No. 81, pp. 21–23.

First, as the Government demonstrates, both Mr. Jones and Mr. Kong wrote detailed reports explaining their analysis. Doc. Nos. 81–9, 81–10. Second, those reports were reviewed by other examiners in the field. Doc. Nos. 81–1, 81–2, 81–3, 81–4. Finally, the two validity requirements discussed by the PCAST Report—that experts must provide evidence demonstrating their rigorous proficiency testing, in addition to whether they were aware of any facts of the case that might influence their conclusion—are not required under

Rule 702(d). Nevertheless, the Government has presented evidence demonstrating the experience, certifications, and continued training of both experts. *See* Doc. Nos. 81–6, 81–7, 81–8; *cf* Doc. No. 81–5. And both experts' examination reports detail what case-specific facts they were aware of when drawing their conclusions. *See* Doc. Nos. 81–1, 81–2. Accordingly, the Court finds that Defendant's objections are without merit.

## VI.   *Daubert* Hearing

As an alternative, Defendant requests a *Daubert* hearing to require the Government to prove that Mr. Jones's and Mr. Kong's testimony will be reliable before admitting their testimony. Doc. No. 17. Again, the Government objects. Doc. No. 81, pp. 24–25. Nothing requires the Court to hold a formal *Daubert* hearing in advance of qualifying an expert. *See Goebel v. Denver and Rio Grande Western RR Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000); *see also Kumho Tire*, 526 U.S. at 152 ("The trial court must have the . . . latitude . . . to decide whether or when special briefing or other proceedings are needed to investigate reliability"). Considering the parties' briefing, in addition to the *Daubert* and Rule 702 analysis above, the Court finds it unnecessary to conduct such a proceeding here. *See, e.g., Ashburn*, 88 F. Supp. 3d at 244 (finding *Daubert* hearing unnecessary). The reliability of the Government's expert testimony has been sufficiently addressed on the briefs. *See Goebel*, 215 F.3d at 1087 (noting that a *Daubert* hearing "is not mandated" and that a district court may "satisfy its gatekeeper role when asked to rule on a motion in limine").

## VII.   **Expert Testimony Limitations**

In his penultimate argument, Defendant asks the Court to place limitations on the Government's firearm toolmark experts because the jury will be unduly swayed by the

experts if not made aware of the limitations on their methodology. Doc. No. 67, p. 18. The Government responds that no limitation is necessary because Department of Justice guidance sufficiently limits a firearm examiner's testimony. Doc. No. 81, pp. 23–24.

Some federal courts have imposed limitations on firearm and toolmark expert testimony. *See, e.g., Ashburn*, 88 F. Supp. 3d at 249. However, many courts have continued to allow unfettered testimony. *See, e.g., Romero-Lobato*, 379 F. Supp. 3d at 1117.

> The general consensus is that firearm examiners should not testify that their conclusions are infallible or not subject to any rate of error, nor should they arbitrarily give a statistical probability for the accuracy of their conclusions. Several courts have also prohibited a firearm examiner from asserting that a particular bullet or shell casing could only have been discharged from a particular gun to the exclusion of all other guns in the world.

*Id.* (citing David H. Kaye, *Firearm-Mark Evidence: Looking Back and Looking Ahead*, 68 Case W. Res. L. Rev. 723, 734 (2018)).

In accordance with recent guidance from the Department of Justice, *see* Doc. No. 81–11, the Government's firearm experts have already agreed to refrain from expressing their findings in terms of absolute certainty, and they will not state or imply that a particular bullet or shell casing could only have been discharged from a particular firearm to the exclusion of all other firearms in the world. Doc. No. 81, p. 24. The Government has also made clear that it will not elicit a statement that its experts' conclusions are held to a reasonable degree of scientific certainty. *Id.*

The Court finds that the limitations mentioned above and prescribed by the Department of Justice are reasonable, and that the Government's experts should abide by those limitations. *See* Doc. No. 81–11, p. 3. To that end, the Governments experts:

> [S]hall not [1] assert that two toolmarks originated from the same source to the exclusion of all other sources. . . . [2] assert that examinations conducted in the forensic firearms/toolmarks discipline are infallible or have a zero error rate. . . . [3] provide a conclusion that includes a statistic or numerical degree of probability except when based on relevant and appropriate data. . . . [4] cite the number of examinations conducted in the forensic firearms/toolmarks discipline performed in his or her career as a direct measure for the accuracy of a proffered conclusion. . . . . [5] use the expressions 'reasonable degree of scientific certainty,' 'reasonable scientific certainty,' or similar assertions of reasonable certainty in either reports or testimony unless required to do so by [the Court] or applicable law.

*Id.* As to the fifth limitation described above, the Court will permit the Government's experts to testify that their conclusions were reached to a reasonable degree of ballistic certainty, a reasonable degree of certainty in the field of firearm toolmark identification, or any other version of that standard. *See, e.g., U.S. v. Ashburn*, 88 F. Supp. 3d 239, 249 (E.D.N.Y. 2015) (limiting testimony to a "reasonable degree of ballistics certainty" or a "reasonable degree of certainty in the ballistics field."); *U.S. v. Taylor*, 663 F. Supp. 2d 1170, 1180 (D.N.M. 2009) (limiting testimony to a "reasonable degree of certainty in the firearms examination field."). Accordingly, the Government's experts should not testify, for example, that "the probability the ammunition charged in Counts Eight and Nine were fired in different firearms is so small it is negligible," *see* Doc. No. 81, p. 5. To the extent Defendant wishes to question or clarify the experts' findings, he may do so through cross examination or through direct examination of his own firearm toolmark expert.

### VIII. Additional Expert Information

Defendant's final objection is to the alleged lack of information relating to Mr. Jones's expert testimony. Doc. No. 67, p. 19. Defendant claims that the Government should be required to provide "a significantly more detailed summary of what it expects Mr. Jones

will testify about." *Id.* Notably, Defendant provides no support for his objection, and the Government has failed to respond in opposition. Upon review, the Court finds that the Government has provided sufficient information relating to Mr. Jones's expert testimony. *See* Doc. No. 81, pp. 4–5; Doc. Nos. 81–1, 81–6, 81–7, 81–9.

### IX. Conclusion

For the forgoing reasons, the Court denies Defendant Hunt's Motion in Limine to Exclude Ballistic Evidence, or Alternatively, for a *Daubert* Hearing, Doc. No. 67.

**IT IS SO ORDERED** this 1st day of June 2020.

_____
**DAVID L. RUSSELL**
**UNITED STATES DISTRICT JUDGE**